**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ADAM DELGADO,
Plaintiff,
v.
UNITED STATES DEPARTMENT OF JUSTICE, et al.,
Defendants.

Civil Action No. 23-88 (RBW)

# MEMORANDUM OPINION

The plaintiff, Adam Delgado, is "a retired [Bureau of Alcohol, Tobacco, Firearms and Explosives ('ATF')] Special Agent who served on the FBI's Joint Terrorism Task Force in Chicago, IL." Complaint Pursuant to Freedom of Information Act ("Compl.") ¶ 1, ECF No. 1. Proceeding pro se, he brings this civil action against the defendants, the United States Department of Justice and the Federal Bureau of Investigation, pursuant to the Freedom of Information Act (the "FOIA"). Id. at 1. Currently pending before the Court is the plaintiff's Motion for Summary Judgment ("Pl.'s Mot."), ECF No. 23, and the Defendants' Cross-motion for Summary Judgment ("Defs.' Mot."), ECF No. 24. Upon careful consideration of the parties' submissions,[1] and the entire record in this case, the Court concludes for the following reasons that it must grant the defendants' motion for summary judgment.

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Defendants' Combined Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment and In Support of Defendants' Cross-Motion ("Defs.' Mem."), ECF No. 24; (2) the Defendants' Statement of Material Facts Not in Genuine Dispute ("Defs.' Facts"), ECF No. 24-1; (3) the Declaration of Michael G. Seidel ("Seidel Decl."), ECF No. 24-4; (4) Defs.' Mot., Exhibit ("Ex.") R (Declaration of Elizabeth Wood, Acting Chief, Information and Privacy Governance Division, Bureau of Alcohol, Tobacco, Firearms and Explosives ("Wood Decl.")), ECF No.24-2; (5) Defs.' Mot., Ex. S (Declaration of Roxanne M. Jensen ("Jensen Decl.")), ECF No. 24-2; (6) Defs.' Mot., Ex. T (Declaration of Joy F. Greene ("Greene Decl.")), ECF No. 24-2; (7) Defs.' Mot., Ex. U (Second Declaration of Michael G. Seidel ("Second Seidel Decl.")), ECF No. 24-2; (8)
(continued . . .)

## I. BACKGROUND

### A. Factual and Administrative Background

The following facts are derived from the statement of facts included with the defendants' cross-motion for summary judgment, unless otherwise noted, as the plaintiff did not respond to the defendants' statement of facts, nor did he submit his own statement of facts. The Court will therefore treat the defendants' facts as conceded. See General Order for Civil Cases Before the Honorable Reggie B. Walton, ¶ 13(d), ECF No. 5 ("If an opposition fails to include a separate concise statement of genuine disputed issues, or a response to the movant's statement of facts, or specific references to the parts of the record relied upon to support the statement or response, the Court may treat as conceded any such facts asserted in the movant's statement of facts.").

In his Complaint, the plaintiff alleges that "[i]n 2021, [he] learned that his official Internal Affairs file maintained by [the] ATF contained documents being withheld because the FBI was the originating agency of some of the documents." Compl. ¶ 6. On March 22, 2021, the plaintiff submitted a FOIA request to the FBI seeking "a copy of the entire FBI file on [the plaintiff] to include the withheld documents, unredacted[.]" Defs.' Mot., Exhibit ("Ex.") A ("Plaintiff's FOIA Request") at 2, ECF No. 24-2.

On March 25, 2021, the FBI "acknowledged [the p]laintiff's request[,]" Defs.' Facts ¶ 3, and, on September 21, 2021, the FBI "informed [the p]laintiff that it located approximately 1,032 pages of potentially responsive records[,]" id. ¶ 5. The FBI also informed the plaintiff that the average processing time for a "large track request" such as his was sixty-six months, id. ¶ 6, and that reducing the scope of his request may expedite the processing time, id. ¶ 7. The plaintiff

Defs.' Mot., Ex. Q (the defendants' "Vaughn Index"), ECF No. 24-2; (9) the Plaintiff's Response to DOJ Response ("Pl.'s Opp'n"), ECF No. 25; and (10) the Defendants' Reply in Support of Motion for Summary Judgment ("Defs.' Reply"), ECF No. 27.

responded that same day, stating "I want all of the pages please. 66 months is unacceptable." Id. ¶ 8. Approximately sixteen months later, on January 12, 2023, the plaintiff brought this action. See generally Compl.

On May 24, 2023, the FBI "advised [the p]laintiff [that] it reviewed 515 pages of records and released 317 pages subject to FOIA Exemptions 6, 7(C), 7(E), and Privacy Act Exemptions (j)(2) and (k)(6)." Id. ¶ 11. The FBI also asserted a Glomar response and "further advised [the p]laintiff that to the extent his request sought material comprising unacknowledged intelligence records, watchlist records, witness security program records, or confidential human source records, [the FBI] could neither confirm nor deny the existence of such materials." Id. Then, on June 23, 2023, the FBI "advised [the p]laintiff that it reviewed 508 pages and released 370 pages subject to FOIA Exemptions 3, 6, 7(C), 7(E), Privacy Act Exemptions (j)(2) and (k)(g), and 50 U.S.C. § 3024(i)(I)[,]" id. ¶ 12, and again advised the plaintiff that it could neither confirm nor deny the existence of any "unacknowledged intelligence records, watchlist records, witness security program records, or confidential human source records," id.

On July 21, 2023, August 23, 2023, and October 23, 2023, FBI "notified [the p]laintiff that it located documents that originated with other government agencies and [that it] was consulting with the agencies of origin regarding document processing." Id. ¶ 13. On September 22, 2023, the FBI "release[d] 12 pages in full that originated with the Department of Housing and Urban Development." Id. ¶ 14. On November 22, 2023, the FBI "released 12 pages of documents that originated with the ATF subject to FOIA Exemptions 6, 7(C) [and] 7(E)." Id. ¶ 15. On December 21, 2023, the FBI "advised [the p]laintiff that it reviewed 103 pages and released seventy-seven pages subject to FOIA Exemptions 5, 6, 7(C), and 7(E)." Id. ¶ 16. On January 22, 2024, the FBI "released twenty-one pages that originated with the Air Force Office

of Special Investigations subject to FOIA Exemptions 5, 6, 7(C), and 7(E)." Id. ¶ 17. Finally, on February 8, 2024, the FBI "made its final production and advised [the p]laintiff of the documents that originated with [the] Department of Defense, seventy-two pages were reviewed and fifty-seven pages were released in part subject to FOIA Exemptions 3, 6, and 7(C)." Id. ¶ 18. In total, the FBI identified 1,136 responsive pages and released 377 pages in full, released 490 pages in part, and withheld 269 pages in full. Seidel Decl. ¶ 90.

### B. Procedural Background

As previously noted, the plaintiff filed his Complaint in this case on January 12, 2023. See Compl. at 1. On May 15, 2024, the plaintiff filed his motion for summary judgment. Pl.'s Mot. at 1. On August 6, 2024, the defendants filed their cross-motion for summary judgment, see Defs.' Mot. at 1, and their combined memorandum of law in opposition to the plaintiff's motion and in support of their cross-motion, see Defs.' Mem. at 1. On August 27, 2024, the plaintiff filed his response to the defendants' cross-motion, see Pl.'s Opp'n at 1, and, on October 31, 2024, the defendants filed their reply in support of their cross-motion, see Defs.' Reply at 1.

## II. STANDARD OF REVIEW

"FOIA cases typically are resolved on a motion for summary judgment." Ortiz v. U.S. Dep't of Just., 67 F. Supp. 3d 109, 116 (D.D.C. 2014) (citation omitted). The "FOIA requires federal agencies to disclose, upon request, broad classes of agency records unless the records are covered by the statute's exemptions." Students Against Genocide v. U.S. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001) (citing 5 U.S.C. § 552(a)(3)(A), (b)); see also Wash. Post Co. v. U.S. Dep't of Just., 863 F.2d 96, 101 (D.C. Cir. 1988) (citation omitted) ("[The] FOIA is to be interpreted with a presumption favoring disclosure and exemptions are to be construed narrowly."). In a FOIA action, the defendant agency has "[the] burden of demonstrating that the

withheld documents are exempt from disclosure[,]" Boyd v. U.S. Dep't of Just., 475 F.3d 381, 385 (D.C. Cir. 2007) (citation omitted), and the district court must "determine the matter de novo," 5 U.S.C. § 552(a)(4)(B); see also U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989) ("[T]he FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"). Moreover, the defendant's burden "cannot be met by mere conclusory statements." Wash. Post Co., 863 F.2d at 101 (citation omitted). "The agency may meet this burden by filing affidavits describing the material withheld and the manner in which it falls within the exemption claimed[,]" King v. U.S. Dep't of Just., 830 F.2d 210, 217 (D.C. Cir. 1987) (citations omitted), and by "show[ing] how release of the particular material would have the adverse consequence that the Act seeks to guard against," Wash. Post Co., 863 F.2d at 101 (citation omitted).

Courts will grant summary judgment to the government in a FOIA case only if the agency can prove "that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." Friends of Blackwater v. U.S. Dep't of Interior, 391 F. Supp. 2d 115, 119 (D.D.C. 2005) (quoting Greenberg v. U.S. Dep't of Treasury, 10 F. Supp. 2d 3, 11 (D.D.C. 1998)). Thus, in a lawsuit brought to compel the production of documents under the FOIA, "an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly[, or partially,] exempt [from disclosure].'" Students Against Genocide, 257 F.3d at 833 (omission in original) (quoting Goland v. Cent. Intel. Agency, 607 F.2d 339, 352 (D.C. Cir. 1978)). However, "[t]he burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could

permissibly occur.'" Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin., 185 F.3d 898, 904–05 (D.C. Cir. 1999) (quoting Nat'l Ass'n of Gov't Emps. v. Campbell, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

## III. ANALYSIS

The plaintiff alleges that "the documents previously specified have been improperly withheld by the FBI." Pl.'s Mot. at 1. In response, in their cross-motion for summary judgment, the defendants claim that they "took appropriate efforts to search for documents, provided all reasonably segregable records, and withheld only that information that is properly exempt from release under FOIA Exemptions 3, 5, 6, 7(C), 7(D), and 7(E); and the Privacy Act[,] 5 U.S.C. § 552(j)(2) and (k)(6)." Defs.' Mem. at 1. In this case, as is customary in FOIA cases, the FBI has provided a Vaughn index which "describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies." Prison Legal News v. Samuels, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015); (citing to Vaughn v. Rosen, 484 F.2d 820, 827 (D.C. Cir. 1973) (requiring that "the agency specify in detail which portions of the document are disclosable and which are allegedly exempt[,]" which "could be achieved by formulating a system of itemizing and indexing that would correlate statements made in the [g]overnment's refusal justification with the actual portions of the document"); Pub. Emps. for Env't Resp. v. Env't. Prot. Agency, No. 18-cv-2219 (BAH), 2021 WL 2515007, at *6 (D.D.C. June 18, 2021) ("An agency may prove the applicability of claimed exemptions through a Vaughn index or supporting affidavits or declarations, or both[.]").

In his response to the defendants' positions, the plaintiff only specifically discusses the adequacy of the defendants' application of FOIA exemptions to records regarding FBI polygraph testing and to the defendants' Glomar response. See Pl.'s Opp'n at 2–3. Nonetheless, because

the plaintiff is proceeding pro se, and because he "requests that [the Court] order the FBI and DOJ to produce those documents withheld from [his] lawfully submitted FOIA request[,]" id. ¶ 2, the Court will assess each of the FOIA exemptions asserted by the defendants. The plaintiff also does not specifically challenge the adequacy of the defendants' search for records, although in his reply to the defendants' cross-motion for summary judgment he does reference purportedly missing records related to alleged FBI interference with a thesis paper he wrote in the 1990s about the assassination of President John F. Kennedy. See id. ¶ 9. The Court will therefore begin by reviewing the adequacy of the defendants' search before assessing the legitimacy of their asserted FOIA exemptions, their Glomar response, and whether they produced all nonsegregable records.

**A. Whether the Defendants' Search Was Adequate**

An agency "fulfills its obligations under the FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 514 (D.C. Cir. 2011) (citations and internal quotation marks omitted). The agency may submit affidavits or declarations to explain the method and scope of its search, see Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982), and such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents," SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation and internal quotation marks omitted).

Here, the defendants' declarant asserts that the FBI's search of its Central Records System ("CRS") using variations of the plaintiff's name, "Delgado, Adam" and "Adam Delgado[,]" as search terms constituted a reasonable search. See Seidel Decl. ¶ 31.

Additionally, the FBI took "the extraordinary step of conducting a targeted search outside the CRS[,]" id. ¶ 32, because the plaintiff "provided [the FBI with] a copy of a declaration filed in an administrative proceeding . . . which named a specific FBI employee" who purportedly exchanged emails with the ATF which referenced the plaintiff, id. ¶ 34. This additional search resulted in 103 pages of responsive records, of which the FBI withheld 26 pages in full and released 77 pages in full or part. Id. ¶ 37. Based on the CRS search and the targeted search, the defendants' declarant determined that "the FBI has searched all locations and files reasonably likely to contain responsive records, and there is no basis for the FBI to conclude that a search elsewhere would reasonably be likely to locate responsive records under the FOIA." Id.

The plaintiff argues that "[t]he FBI does not claim that the FBI sought out University of Illinois at Chicago Professor Richard Ward." Pl.'s Opp'n at ¶ 9. According to the Complaint, Dr. Richard Ward was the plaintiff's thesis advisor and, in 1992-93 while the plaintiff was working on his thesis regarding the assassination of President John F. Kennedy, Dr. Ward allegedly advised the plaintiff that "someone from the government tried to contact [Dr. Ward]" and Dr. Ward thereafter advised the plaintiff that "[he] was too busy and could no longer act as [the plaintiff's] thesis advisor." Compl. ¶ 3. Subsequently, the plaintiff's replacement thesis advisor allegedly told the plaintiff that "he needed to change his thesis topic as it was no longer a valid topic." Id.

"[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." Iturralde v. Comptroller of the Currency, 315 F.3d 311, 315 (D.C. Cir. 2003) (citing Steinberg v. U.S. Dep't of Just., 23 F.3d 548, 551 (D.C. Cir. 1994)). An agency "need not demonstrate . . . that it located every document that the FOIA requester expected the agency to find," Pejouhesh v. U.S. Postal Serv.,

17-cv-1684 (RDM), 2019 WL 1359292, at *4 (D.D.C. Mar. 26, 2019), or that it "search[ed] every record system," Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990), or that its search was exhaustive, see Bigwood v. U.S. Dep't of Def., 132 F. Supp. 3d 124, 135 (D.D.C. 2015). As Bigwood indicates, "the proper inquiry is not whether there might exist additional documents possibly responsive to a request, but whether the agency conducted a search reasonably calculated to uncover relevant documents." Bigwood, 132 F. Supp. 3d at 135.

Here, the defendants have provided a reasonably detailed and non-conclusory declaration describing the contents and organization of the CRS, the search terms FBI staff employed to search the CRS, and the additional targeted search apart from the CRS search. The declaration is "presumed to have been submitted in good faith, and the plaintiff's speculation about the existence of additional responsive records neither rebuts that presumption nor creates a genuine dispute of material fact as to the FBI's compliance with its search obligations under the FOIA." Spurling v. U.S. Dep't of Just., 425 F. Supp. 3d 1, 12 (D.D.C. 2019) (Walton, J.) (citing Davis v. FBI, 18-cv-0086 (CRC), 2019 WL 2870729, at *6 (D.D.C. July 3, 2019) and Richardson v. U.S. Dep't of Just., 17-cv-1181 (JDB), 2018 WL 4637364, at *4 (D.D.C. Sept. 27, 2018). The defendants' failure to locate particular documents related to the purported government interaction with Dr. Ward regarding the plaintiffs' thesis paper does not render its search inadequate, see Iturralde, 315 F.3d at 315; Perry, 684 F.2d at 128, particularly since the plaintiffs' FOIA request specifically sought "a copy of the entire FBI file on me" without any reference to Dr. Ward. See Plaintiff's FOIA Request at 2. The Court therefore concludes that the FBI conducted a reasonable search for records responsive to the plaintiff's FOIA request.

**B. Whether the Defendants Properly Withheld Information Pursuant to FOIA Exemption 3**

FOIA Exemption 3 excludes from compelled disclosure matters that are "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). Under this exemption, the defendants need only show that the statute relied upon qualifies as a withholding statute and "that the withheld material falls within the statute." Larson v. U.S. Dep't of State, 565 F.3d 857, 865 (D.C. Cir. 2009). A statute falls under the purview of Exemption 3 only if it "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," "establishes particular criteria for withholding[,] or refers to particular types of matters to be withheld." Morley v. Cent. Intel. Agency, 508 F.3d 1108, 1125 (D.C. Cir. 2007).

Here, the FBI argues that it "properly asserted this exemption . . . pursuant to Section 102A(i)(1) of the National Security Act of 1947, as amended by the Intelligence Reform and Terrorism Prevention Act of 2004." Defs.' Mot. at 16. Specifically, relying on the National Security Act of 1947, the FBI applied Exemption 3 to "name check requests and arrest reports of third-party individuals, and polygraph report information." Id. According to the defendants' declarant, "the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to [the plaintiff]." Seidel Decl. ¶ 48.

The National Security Act requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). The question for the Court, therefore, is whether the withheld material relates to intelligence sources and methods. See Larson, 565 F.3d at 865. In answering that question, if "an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record

does not suggest otherwise[,]" then "the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions." Id. Here, the defendants' affidavit provides that "[t]he disclosure of the existence or nonexistence of a national security investigation could reasonably be expected to result in harm to the national security, because disclosure would provide adversaries with valuable insight into the FBI's investigative efforts," which those adversaries could use to "devise more effective counter-surveillance techniques to shield their activities from detection." Second Seidel Decl. ¶ 19.

Relatedly, Joy F. Greene, the Supervisory Government Information Specialist of the Defense Counterintelligence and Security Agency ("DCSA"), Freedom of Information Act and Privacy Office, submitted a declaration in which she states that the DCSA reviewed the plaintiff's 49-page Defense Investigative Service Record background investigation. Greene Decl. ¶¶ 1, 5. Based upon that review, Ms. Greene further states that, of the 49 pages, 21 were released in full and 28 were releasable in part with information withheld pursuant in part to FOIA Exemption (b)(3). Greene Decl. ¶ 5. According to Ms. Greene, FOIA Exemption 3 was "briefly cited on two (2) of the forty-nine (49) pages" and the information withheld pursuant to FOIA Exemption (b)(3) "pertained to a records search conducted with the Central Intelligence Agency." Id. ¶ 6. And, the information was withheld because its disclosure "would constitute a harm of which the Central Intelligence Agency Act of 1949 was enacted to protect, namely, the release of intelligence sources and methods." Id. ¶ 7.

The plaintiff has not specifically challenged the defendants' decision to withhold records pursuant to Exemption 3. Therefore, and without any specific counterarguments from the

plaintiff, the Court concludes that the defendants properly withheld information under FOIA Exemption 3.[2]

**C. Whether the Defendants Properly Withheld Information Pursuant to FOIA Exemption 5**

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorand[a] or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). "Exemption 5 incorporates the privileges that the [g]overnment may claim when litigating against a private party, including the governmental attorney-client and attorney work product privileges, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege." Abtew v. U.S. Dep't of Homeland Sec., 808 F.3d 895, 898 (D.C. Cir. 2015).

Here, the FBI invokes the deliberative process privilege, which "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news[.]" U.S. Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8–9 (2001). Thus, the "privilege shields documents 'reflecting advisory opinions, recommendations, and deliberations' that agencies use to make decisions." Emuwa v. U.S. Dep't of Homeland Sec., 113 F.4th 1009, 1013 (D.C. Cir. 2024) (quoting U.S. Fish & Wildlife Serv. v. Sierra Club, Inc., 592 U.S. 261, 267 (2021)). "The privilege ensures that 'debate and candid considerations of alternatives within an agency' are not subject to public inspection." Id. (quoting Machado Amadis v. U.S. Dep't of State, 971 F.3d 364, 371 (D.C. Cir. 2020)).

[2] The Court notes that the material withheld pursuant to FOIA Exemption 3 was also withheld pursuant to other exemptions. See Defs.' Mot., Ex. Q (Vaughn Index) at Bates entries 125–27, 280, 564, 860, and 972. For the reasons discussed in more detail below, the Court also finds that the material was also appropriately withheld pursuant to those exemptions.

"The privilege may only be invoked for documents that are both predecisional and deliberative." Reps. Comm. for Freedom of the Press v. FBI, 3 F.4th 350, 362 (D.C. Cir. 2021) (citing U.S. Fish & Wildlife Serv., 592 U.S. at 268). To be predecisional, a document must have been "generated before the agency's final decision on the matter[.]" Id. (quoting U.S. Fish & Wildlife Serv., 592 U.S. at 268). And, "[a] document is deliberative when it is 'prepared to help the agency formulate its position[,] . . . and it 'reflects the give-and-take of the consultative process[.]'" Id. (internal citations omitted). "The agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" Senate of P.R. ex. rel. Judiciary Comm. v. U.S. Dep't of Just., 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quoting Coastal States Gas Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 868 (D.C. Cir. 1980)). "The need to describe each withheld document when Exemption 5 is at issue is particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" Pub. Emps. for Env't Resp., 213 F. Supp. 3d at 11 (D.D.C. 2016) (quoting Animal Legal Def. Fund, Inc. v. U.S. Dep't of the Air Force, 44 F. Supp. 2d 295, 299 (D.D.C. 1999)). Accordingly, "to sustain its burden of showing that records were properly withheld under Exemption 5, an agency must provide in its declaration . . . precisely tailored explanations for each withheld record at issue." Nat'l Sec. Couns. v. Cent. Intel. Agency, 960 F. Supp. 2d 101, 188 (D.D.C. 2013). "[T]he agency must [also] describe 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document(s), and the positions in the chain of command of the parties to the documents.'" Elec. Frontier Found. v. U.S. Dep't of Just., 826 F. Supp. 2d 157, 168 (D.D.C. 2011) (Walton, J.) (quoting Arthur Andersen & Co. v. Internal Revenue Serv., 679 F.2d 254, 258 (D.C. Cir. 1982)). "If the agency does not provide 'the minimal information necessary to make a

determination concerning applicability of the deliberative process privilege[,]' then the court should deny the agency summary judgment." Hunton & Williams LLP v. Env't Prot. Agency, 248 F. Supp. 3d 220, 241 (D.D.C. 2017) (quoting Elec. Frontier Found., 826 F. Supp. 2d at 173).

Even where the exemption applies, the FOIA Improvement Act of 2016 requires the agency to disclose the information requested unless it "reasonably foresees that disclosure would harm an interest protected by" the FOIA Exemption at issue, i.e., Exemption 5 in this case. Reps. Comm. for Freedom of the Press, 3 F.4th at 369 (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)). In the context of Exemption 5, the agency must offer a "focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." Id. at 370. This burden is "context specific[,]" id. (citations omitted), and the agency may not rely on "cookie-cutter formulations" of harm, see id. at 371.

Here, the FBI asserted FOIA Exemption 5 and the deliberative process privilege "to protect two types of information: [1] internal deliberative communications and [2] draft documents containing deliberative information." Seidel Decl. ¶ 53. According to the FBI's declarant, "[t]his information was located within [the plaintiff's] personnel file and [was] created to document discussion between both the ATF and FBI, related to [the plaintiff's] time on the Joint Terrorism Task Force." Id. The FBI also "asserted [FOIA] Exemption 5 pursuant to the deliberative process privilege to withhold deliberative email communications." Id. ¶ 54. The plaintiff has not specifically challenged the defendants' decision to withhold records pursuant to FOIA Exemption 5.

The FBI records withheld pursuant to FOIA Exemption 5, which are described in the Vaughn Index as "Internal Letter[s] . . . Between Special Agents[,]" see generally Vaughn Index,

appear to be precisely the type of material contemplated by FOIA Exemption 5. The withheld communications "include[] emails and draft letters between ATF and FBI management detailing information related to then employee, [the plaintiff]." Seidel Decl. ¶ 54. The declarant explains that these emails and draft letters "contain redline comments and edits or are attached to emails which notate specific edits to be made to attached draft letters" and that this material "is pre-decisional in that it does not reflect final agency decisions." Id. The FBI has also adequately explained the reasonably foreseeable harm in the release of this material, which, according to the defendants' declarant, "would be a chilling effect on agency employees' willingness to share raw, unrefined ideas and candid feedback" and that "release of this material would create public confusion as this material predates final agency action." Id.

Relatedly, Roxanne M. Jensen, the Information Release Branch Chief assigned to Headquarters Air Force Office of Special Investigations ("OSI"), provided a declaration in which she states that the FBI requested that OSI "review responsive documents that contained OSI equities." Jensen Decl. ¶¶ 1–2. According to Ms. Jensen, the OSI "redacted recommendations made by individuals who were asked their opinion about a candidate for employment" pursuant to FOIA Exemption 5 because "[p]rotecting this information is essential to ensuring individuals are comfortable providing their true opinions so that a candidate may be fairly evaluated" and "[r]eleasing this information would risk an unreasonable chilling effect and adversely impact the usefulness of background investigations." Id. ¶ 4.

Upon consideration of the explanations in these declarations, and the plaintiff's failure to contest to these withholding under FOIA Exemption 5, the Court concludes that the defendants' application of FOIA Exemption 5 to "recommendations and deliberations comprising part of the process by which agency decisions were made related to [the p]laintiff's suitability for hire or

[the p]laintiff's assignment on the Joint Terrorism Task Force[,]" Defs.' Mem. at 19, was appropriate.

**D. FOIA Exemptions 6 and 7(C)**

Under FOIA Exemption 6, "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" are exempt from disclosure. 5 U.S.C. § 552(b)(6). Similarly, FOIA Exemption 7(C) protects records compiled for law enforcement purposes that "could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]" Id. § 552(b)(7). The defendants represent that "[t]he practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C)" because "the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion." Seidel Decl. ¶ 58 n.16.

**1. Exemption 6**

"The 'primary purpose' of Exemption 6 is to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'" Hum. Rts. Def. Ctr. v. U.S. Park Police, 126 F.4th 708, 713 (D.C. Cir. 2025) (quoting U.S. Dep't of State v. Wash. Post. Co., 456 U.S. 595, 599 (1982)). "Exception 6 may apply to entire files or may call for redaction of 'bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy.'" Id. (quoting Jud. Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 152–53 (D.C. Cir. 2006)).

The Court must undertake a two-part inquiry to determine whether Exemption 6 applies. First, the Court must determine "whether disclosure would compromise a substantial, as opposed to a de minimis, privacy interest." Id. (quoting Niskanen Ctr. v. Fed. Energy Regul. Comm'n, 20 F.4th 787, 791 (D.C. Cir. 2021)). "The government bears the burden of showing that a substantial invasion of privacy will occur if the documents are released[,]" Prison Legal News,

787 F.3d at 1147 (citing Ripskis v. Dep't of Hous. & Urban Dev., 746 F.2d 1, 3 (D.C. Cir. 1984)), and it may satisfy this burden with affidavits "if they contain reasonable specificity of detail rather than conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." Jud. Watch, Inc. v. U.S. Secret Serv., 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting Consumer Fed'n of Am. v. U.S. Dep't of Agric., 455 F.3d 283, 287 (D.C. Cir. 2006)).

If the agency satisfies its initial burden, the Court must then "balance the individual's right of privacy against the public interest in disclosure." Niskanen Ctr., 20 F.4th at 791 (quoting Prison Legal News, 787 F.3d at 1147). "[T]he balancing inquiry focuses 'not on the general public interest in the subject matter of the FOIA request, but rather on the incremental value of the specific information being withheld.'" Id. (quoting Schrecker v. U.S. Dep't of Just., 349 F.3d 657, 661 (D.C. Cir. 2003)). And, the only relevant public interest in this analysis is "the extent to which disclosure of the information sought would 'shed light on the agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" U.S. Dep't of Def. v. Fed. Labor Rels. Auth., 510 U.S. 487, 497 (1994) (quoting Reps. Comm. for Freedom of the Press, 489 U.S. at 773).

**2. Exemption 7(C)**

FOIA Exemption 7(C) protects records compiled for law enforcement purposes that "could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(7). "To show that . . . documents were compiled for law enforcement purposes, the [agency] need only establish a rational nexus between [an] investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law." Blackwell v. FBI, 646 F.3d 37, 40 (D.C. Cir. 2011).

In determining whether FOIA Exemption 7(C) applies to a particular record, the Court must balance the privacy interest of individuals mentioned in the records against the public interest in disclosure. See Am. C.L. Union v. U.S. Dep't of Just., 655 F.3d 1, 6 (D.C. Cir. 2011). The privacy interest at stake belongs to the individual, not the government agency, see Reps. Comm. for Freedom of the Press, 489 U.S. at 763–65, and "[w]hen balancing an individual's privacy interest against the public interest in disclosure, the only public interest relevant for purposes of Exemption 7(C) is one that focuses on the citizens right to be informed about what their government is up to." Davis v. U.S. Dep't of Just., 968 F.2d 1276, 1282 (D.C. Cir. 1992) (internal quotations omitted). It is a FOIA requester's obligation to articulate a public interest sufficient to outweigh an individual's privacy interest, and the public interest must be significant. See Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 172 (2004).

**3. Whether the Defendants Properly Withheld Information Pursuant to FOIA Exemptions 6 and 7(C)**

Here, the Court must assess the defendants' assertion of FOIA Exemptions 6 and 7(C) to withhold the names and identifying information of: (1) FBI Special Agents and professional staff "[who] were responsible for conducting, supervising, and/or maintaining the administrative activities related to the investigations of [the plaintiff;]" Seidel Decl. ¶ 61, (2) "third-party individuals who were interviewed, and/or provided information by other means, to the FBI during its background investigation of [the plaintiff;]" id. ¶ 64, (3) "third parties who were merely mentioned in the investigative records responsive to [the p]laintiff's request[;]" id. ¶ 67, (4) "non-FBI, federal, government agencies who provided information to or otherwise assisted the FBI in its investigations concerning [the plaintiff;]" id. ¶ 68, and (5) "local law enforcement employees" who "aided the FBI in the law enforcement investigative activities reflected in the records responsive to [the] plaintiff's request[;]" id. ¶ 69. The defendants argue that the

individuals in each of these categories have a substantial privacy interest in keeping their names and other identifying information out of the public record and that there is no public interest in disclosing their names and other identifying information. See id. ¶¶ 61–69.

The Seidel Declaration states that the FBI employees, other federal government non-FBI employees, and local law enforcement officers whose names were redacted could be targeted for reprisal or harassment based on their involvement in specific investigations, id. ¶¶ 63, 68–69, and that the third-party individuals who were interviewed or provided information to the FBI during its background investigation of the plaintiff "maintain substantial and legitimate privacy interests in not having their cooperation or connection to FBI law enforcement matters disclosed[,]" id. ¶ 64. Similarly, according to the Seidel Declaration, third party individuals who were merely mentioned in the records "maintain substantial and legitimate privacy interests in not having this information disclosed and thus, being connected with FBI law enforcement matters." Id. ¶ 67. Conversely, according to the Seidel Declaration, the disclosure of these individuals' names and other identifying information would serve no public interest because it would not "significantly increase the public's understanding of the FBI's operations and activities[,]" id. ¶ 63, and "because it would not shed light on the operations and activities of the FBI[,]" id. ¶ 69. The plaintiff does not articulate any public interest in support of his request for disclosure.

Furthermore, a declaration from Elizabeth Wood, the Acting Chief of the Information and Privacy Governance Division at the Bureau of Alcohol, Tobacco, Firearms and Explosives, avers that the ATF asserted FOIA Exemption 6 over 12 pages of records which the FBI referred to ATF. Wood Decl. at 1–2. Specifically, Ms. Wood represents that, pursuant to FOIA Exemptions 6 and 7(C), the ATF redacted "individual names, initials, phone numbers, and fax

numbers" and the names of ATF personnel security specialists, but not the names of any ATF Special Agent in Charge, Assistant Special Agent in Charge, or any other senior law enforcement official. Id. at 2–3. Similarly, the Greene Declaration indicates that the DCSA withheld "the identities of investigative and adjudicative personnel" involved in the plaintiff's background investigation and "the names of third parties interviewed in the conduct of the [plaintiff's] background investigation" pursuant to FOIA Exemptions 6 and 7(c). See Greene Decl. ¶¶ 8–9, 11. The Greene Declaration provides a description similar to the Seidel Declaration of the harm that disclosing these individuals' identities could cause. See id. ¶¶ 10, 12. The Jensen Declaration also states that OSI withheld information pursuant to FOIA Exemptions 6 and 7(c). Jensen Decl. ¶ 2. Specifically, she declares that OSI redacted individuals' names, phone numbers, and "other personal details" in OSI records "after concluding that the privacy interests of the individuals outweighed the public interest in disclosure because disclosure would not shed light on any potential misconduct on the part of a federal agency[,]" id. ¶ 5. And, in regards to personal information in law enforcement records, the OSI "balanced the privacy interests at stake against the public interest in disclosure and concluded the privacy interests outweighed any interest in disclosure because disclosure would not shed significant light on the operations and activities of OSI as an agency[,]" id. ¶ 6.

Upon consideration of the statements in these affidavits, and without specific counterargument from the plaintiff, the Court must conclude that the defendants have appropriately asserted FOIA Exemptions 6 and 7(C) as the basis for its withholdings.

**E. Whether the Defendants Properly Withheld Information Pursuant to FOIA Exemption 7(D)**

FOIA Exemption 7(D) protects from disclosure records or information compiled for law enforcement purposes that

> could reasonably be expected to disclose the identity of a confidential source . . . [who] furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation . . . , information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D). There is no general "presumption that a source is confidential within the meaning of [FOIA] Exemption 7(D) whenever [a] source provides information [to a law enforcement agency] in the course of a criminal investigation." U.S. Dep't of Just. v. Landano, 508 U.S. 165, 181 (1993). Rather, a source's confidentiality must be determined on a case-by-case basis. Id. at 179–80. "A source is confidential within the meaning of [E]xemption 7(D) if the source 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'" Williams v. FBI, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (per curiam) (quoting Landano, 508 U.S. at 170–74).

Here, the FBI asserted FOIA Exemption 7(D) "to protect information provided to the FBI by a foreign government agency under implied assurances of confidentiality." Seidel Decl. ¶ 73. According to the Seidel Declaration, "[t]he FBI solicits and receives information regularly from state, local, and foreign agencies and authorities in connection with a wide variety of criminal and national security investigations[]" and although this information sharing is not necessarily under an express assurance of confidentiality, the declaration states that "[i]nherent in this cooperative effort is the mutual understanding that the identities of the foreign government agency's sources and the information provided by them will be held in confidence by the FBI, and not released pursuant to FOIA and Privacy Act requests." Id. Similarly, the OSI withheld

information about "[a] source of [] information [who] was not required to cooperate with OSI and [who] has the potential to provide important information relating to OSI's investigations in the future" after determining that "disclosing the information provided by this source would result in the source being less willing to cooperate with OSI in the future." Greene Decl. ¶ 7.

"The mere fact that a person . . . provides information to a law enforcement agency does not render that person a confidential source within the meaning of [FOIA Exemption] 7(D)[,]" Campbell v. U.S. Dep't of Just., 164 F.3d 20, 34 (D.C. Cir. 1998) (internal quotation marks and citation omitted), and "[w]hen no express assurance of confidentiality exists, courts consider a number of factors to determine whether the source nonetheless spoke with an understanding that the communication would remain confidential." Roth v. U.S. Dep't of Just., 642 F.3d 1161, 1184 (D.C. Cir. 2011) (quoting Landano, 508 U.S. at 172). "These factors include the character of the crime at issue, the source's relation to the crime, whether the source received payment, and whether the source has an ongoing relationship with the law enforcement agency and typically communicates with the agency only at locations and under conditions which assure the contact will not be noticed." Id. (internal quotations and citation omitted) (quoting Landano, 508 U.S. at 179).

Here, the Seidel Declaration states that "[i]t is reasonable for the FBI to infer that foreign government agencies would not share information without an expectation of confidentiality" because "[d]isclosure could reveal the information the foreign government agency provided to the FBI in confidence as well as alienate the agency's position within their country for sharing such information with the United States" and "[p]ublicity, adverse or otherwise, concerning information provided to the FBI by foreign government agencies could be detrimental to the necessary cooperation of the foreign government agencies with the FBI." Seidel Decl. ¶ 73.

Without any contrary argument from the plaintiff, the Court concludes that the Seidel Declaration's statements regarding the nature of the ongoing relationship between the FBI and foreign government agencies, and the Greene declarations statement regarding the ongoing relationship between the OSI and its confidential source, demonstrate that implied confidentiality existed such that the material was properly withheld under Exemption 7(D). See Spurling, 425 F. Supp. 3d at 23.

**F. Whether the Defendants Properly Withheld Information Pursuant to FOIA Exemption 7(E)**

FOIA Exemption 7(E) protects records compiled for law enforcement purposes that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(7)(E).

Thus, a record must satisfy three requirements to qualify for the exemption: "(1) the record must be 'compiled for law enforcement purposes'; (2) the record's release must disclose techniques, procedures, or guidelines used for law enforcement investigations or prosecutions; and (3) disclosure of those techniques, procedures, or guidelines must 'reasonably be expected to risk circumvention of the law.'" Nat'l Ass'n of Minority Veterans v. U.S. Dep't of Veterans Affs., No. 21-cv-1298 (RC), 2024 WL 810032, at *3 (D.D.C. Feb. 27, 2024) (quoting Advancement Project v. U.S. Dep't of Homeland Sec., 549 F. Supp. 3d 128, 142 (D.D.C. 2021)). The third requirement presents "a relatively low bar for the agency to justify withholding[,]" Blackwell, 646 F.3d at 42, and, "[r]ather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the

law." Mayer Brown LLP v. IRS, 562 F.3d 1190, 1194 (D.C. Cir. 2009) (internal quotation and citation omitted) (second alteration in original).

The FBI asserted Exemption 7(E) to protect four categories of information: (1) "secure fax numbers, internal e-mail addresses, non-public intranet web addresses and telephone numbers, and secure internal e-mail tools[;]" Seidel Decl. ¶ 77, (2) "the identities of sensitive investigative databases and database search results located through queries of these non-public databases used for official law enforcement purposes by the FBI[;]" id. ¶ 79, (3) "information relating to coordination with [] Other Government Agenc[ies] (OGA)[;]" id. ¶ 84, and (4) "procedures and techniques used by FBI investigators to conduct polygraph examinations, to include detailed non-public information about the use of pre-employment polygraphs[;]" id. ¶ 85.[3]

In regards to the first category—"secure fax numbers, internal e-mail addresses, non-public intranet web addresses and telephone numbers, and secure internal e-mail tools[—]" the Seidel Declaration states that disclosure of "this type of information could provide criminals with specific targets for possible cyber-attacks and other types of attacks on FBI secure communications" and that "the release of this type of information could provide hackers with avenues to exploit the FBI's Information Technology system." Id. ¶ 77. Additionally, according to the Seidel Declaration, releasing the non-public telephone numbers of FBI personnel "would provide criminals with specific targets for attacks on FBI communication through 'spoofing' or other illegal means." Id. ¶ 78. Thus, the Seidel Declaration concludes that "[r]eleasing this

[3] The FBI also withheld this fourth category of information pursuant to Privacy Act Exemption (k)(6), which "exempt[s] any system of records [from disclosure] if the system of records is . . . testing or examination material used solely to determine individual qualifications for appointment or promotion in the Federal service the disclosure of which would compromise the objectivity or fairness of the testing or examination process." 5 U.S.C. § 552a(k)(6).

information poses substantial risks to the FBI's ability to carry out its mission effectively, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law." Id.

In regard to the second category—"the identities of sensitive investigative databases and database search results located through queries of these non-public databases used for official law enforcement purposes by the FBI[—]" the FBI's declarant asserts that "[r]eleasing the identities of these databases and any information located through queries of these databases would give criminals insight into the available tools and resources the FBI uses to conduct criminal and national security investigations" such as "the scope of information stored within the databases, how the FBI uses the databases to support its investigations, the types of information most valued by the FBI for particular investigations, and vulnerabilities of the databases." Id. ¶ 79. The declarant further declares that releasing this information would "expose possible intelligence gaps and/or intelligence gathering strengths [which] would allow criminals to make informed decisions on how they might structure their behavior to exploit these strengths and weaknesses and avoid detection and/or disruption by the FBI[,]" id. ¶ 80, "would reveal the types of information most useful to FBI investigators[,]" id. ¶ 81, and "could jeopardize the FBI's investigative mission by revealing exactly where the FBI is storing and obtaining valuable investigative data[,]" id. ¶ 82.

The third category of material withheld pursuant to Exemption 3 involves "information relating to [the FBI's] coordination with an Other Government Agency (OGA)." Id. ¶ 84. According to the Seidel Declaration, "[t]he FBI solicits and receives information regularly from OGAs in connection with a wide variety of criminal and national security investigations[,]" and in this case, "the information withheld is directly related to the results of inquiries the FBI made

to [OGAs] as part of the FBI's preemployment background investigation of [the p]laintiff." Id. The Seidel Declaration represents that "[i]nherent in this cooperative effort is the mutual understanding that the information provided by these OGAs, as well as the relationship between the FBI and these OGAs will be held in confidence by the FBI, and not released pursuant to FOIA and Privacy Act requests." Id. According to the Seidel Declaration, the release of this information "could reveal the identity of the OGA and the information the OGAs provided to the FBI in confidence and alienate the OGA from sharing such information with the FBI in future matters." Id.

Considering the "low bar for the agency to justify withholding" under Exemption 7(E), Blackwell, 646 F.3d at 42, and the lack of any argument from the plaintiff challenging these withholdings, the Court concludes that the defendant has appropriately applied Exemption 7(E) to these three categories of records.

The plaintiff does, however, appear to specifically object to the defendants' application of Exemption 7(E) to the fourth category—procedures and techniques used by FBI investigators to conduct polygraph examinations, because he claims that "a simple Google search will reveal the topics of the polygraph questions" and "a self-proclaimed former FBI agent lists information on his website, FBIRETIRED.COM[,] explaining the polygraph examination process." Pl.'s Opp'n ¶ 6. The FBI responds that "Mr. Seidel's declaration explained how polygraph questions are guarded information and why revealing questions, the administration procedures, or how the FBI interprets results would circumvent the law." Defs.' Reply at 6. As the FBI notes, the Seidel Declaration explains that "the details of the FBI's methodology for conducting polygraphs is highly guarded information[,]" the disclosure of which "could enable individuals subject to polygraph examinations - including applicants, employees, and individuals involved in law

enforcement investigations - to educate themselves about pre-employment and operational polygraph examinations and develop countermeasures to circumvent the effectiveness of the examinations." Seidel Decl. ¶ 85.

The defendants also argue that the plaintiff's attempt "to rely on an allegedly former FBI employee's editorial publication regarding polygraphs as a waiver that would undermine the FBI's application of Exemption 7(E) and compel disclosure . . . fails" because it does not meet the standard that this Circuit has developed to determine whether a public disclosure has been officially acknowledged. Defs.' Reply at 6. "If the government has officially acknowledged information, a FOIA plaintiff may compel disclosure of that information even over an agency's otherwise valid exemption claim." Am. C.L. Union v. U.S. Dep't of Def., 628 F.3d 612, 620 (D.C. Cir. 2011). Information has been officially acknowledged when: "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented source." Id. (quoting Wolf v. Cent. Intel. Agency, 473 F.3d 370, 378 (D.C. Cir. 2007)). The defendants dispute that the polygraph records at issue here have been officially acknowledged and there is nothing in the record to suggest that any information purportedly available on "FBIRETIRED.COM" has been made public through an official and documented source.

Therefore, the Court must conclude that the polygraph records have not been officially acknowledged and the defendants appropriately applied to Exemption 7(E).

### G. Whether the Defendants Properly Asserted a Glomar Response

"In addition to withholding records that are exempt, an agency may issue a Glomar response, i.e., refus[al] to confirm or deny the existence or nonexistence of responsive records if

the particular FOIA exemption at issue would itself preclude the acknowledgement of such documents." Elec. Priv. Info. Ctr. v. Nat'l Sec. Agency, 678 F.3d 926, 931 (D.C. Cir. 2012). When asserting a Glomar response, "[t]he agency must demonstrate that acknowledging the mere existence of responsive records would disclose exempt information[,]" id., and "courts may grant summary judgment on the basis of agency affidavits that contain 'reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith[,]'" id. (quoting Gardels v. Cent. Intel. Agency, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). "In reviewing an agency's Glomar response, [the] Court exercises caution when the information requested 'implicat[es] national security, a uniquely executive purview.'" Id. (quoting Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 926–27 (D.C. Cir. 2003)). Here, the defendants have asserted a Glomar response over "unacknowledged documents comprising (1) individuals named on a watchlist, (2) records which could identify any participant in the Witness Security Program, or (3) confidential informant Record." Defs.' Mot. at 12.

Regarding individuals named on a watchlist, the defendant's declarant states that "[w]hen the FBI receives a request for records on an individual pursuant to the Privacy Act or the FOIA, the FBI consistently neither confirms nor denies the existence of watchlist records in all such requests[,]" Second Seidel Decl. ¶ 23, because "given the sensitive information contained in the watch list, the mere acknowledgment of the existence or non-existence of responsive records would trigger harm to an interest protected by FOIA Exemption 7(E)[,]" id. ¶ 26. The Second Seidel Declaration explains that "[i]f an individual knows who is or is not on a watchlist, they can understand what types of behavior are pertinent to placement on a watch list [which] would

allow criminals to develop countermeasures to conceal their activities and thwart efforts to combat crime and protect the national security of the United States." Id. ¶ 25.

Similarly, the Second Seidel Declaration states that its standard Glomar response to records related to the Witness Security Program was appropriate because "[i]nformation concerning the Witness Security Program is protected by statute, specifically 18 U.S.C. § 3521(b)(1)(G)[,]" id. ¶ 20, and, in addition to being statutorily prohibited from being disclosed under Exemption 3, "[t]he mere acknowledgment of the existence or non-existence of such records in the context of and in response to a particular request triggers foreseeable harm to the operations of the federal Witness Security Program and its participants[,]" id. ¶ 21.[4]

Finally, the Second Seidel Declaration represents that the FBI also relies on a standard Glomar response regarding confidential informants or confidential human sources ("CHS") in all responses to requests for records of such individuals. Id. ¶ 29. According to the Second Seidel Declaration, disclosure of this information "would endanger FBI CHSs as the FBI's FOIA responses would create a pattern whereby criminals could easily discern who is and is not an FBI CHS[,]" which "would expose FBI CHSs to reprisal, in many forms, by those on whom they provided information and others who may think negatively of their cooperation with the FBI." Id. Additionally, disclosure "would dissuade current and future sources from providing critical, law enforcement relevant information to the FBI" because it would "indicate an unwillingness on the part of the FBI to take appropriate measures to ensure the safety and confidentiality of its CHSs." Id.

[4] The FBI also withheld information pertaining to the existence or nonexistence of an individual's name on a watch list and of the existence or nonexistence of records which could identify a participant in the Witness Security Program pursuant to § 552a(j)(2).

The plaintiff does not raise any specific objection to these responses, but rather "requests [that the Court] meet in camera with the parties so that [the Court] can review these highly sensitive documents that must be protected to ensure the national security of our country." Pl.'s Opp'n ¶ 2. The plaintiff has not presented any "contradictory evidence" to "call[] into question" the validity of the defendants' Gomar assertion, nor has he presented any evidence that the defendants acted in bad faith in making their Gomar response. See Elec. Priv. Info. Ctr., 678 F.3d at 931. Accordingly, because the defendants' declarations contain "reasonable specificity of detail[,]" the Court finds that the defendants' Glomar response is appropriate and in camera review of the withheld materials is unwarranted.

**H. Segregability**

The Court now turns to whether the defendants have provided all reasonably segregable records to the plaintiff. Under the FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b); see also Roth v. U.S. Dep't of Just., 642 F.3d at 1167 ("[E]ven if [the] agency establishes an exemption, it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." (alteration in original) (citation omitted)). Thus, "[i]t has long been the rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Wilderness Soc'y v. U.S. Dep't of Interior, 344 F. Supp. 2d 1, 18 (D.D.C. 2004) (Walton, J.) (alteration in original) (quoting Mead Data Cent., Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977)). Accordingly, "[b]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1116 (D.C. Cir. 2007).

In order to assess segregability, a "district court must be provided with a 'relatively detailed description' of the withheld material." Jud. Watch, Inc. v. U.S. Dep't of Def., 245 F. Supp. 3d 19, 36 (D.D.C. 2017) (Walton, J.) (citing Goldberg v. U.S. Dep't of State, 818 F.2d 71, 78 (D.C. Cir. 1987)). To comply with this requirement, "[a]gencies must review the withheld documents and determine whether, absent the exempted material, the resulting document would still be comprehensible, or whether 'the result would be an essentially meaningless set of words and phrases.'" Id. at 36 (citing Mead Data Ctr., 566 F.2d at 261). "[T]o show that an entire document cannot be produced[,]" an agency must conduct "[a] 'document-by-document' review and [provide] a declaration that each piece of information that is withheld is not reasonably segregable[.]" Id. at 36–37 (citing Juarez v. U.S. Dep't of Just., 518 F.3d 54, 61 (D.C. Cir. 2008)). Although "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material[,]" Ecological Rts. Found. v. Env't Prot. Agency, 541 F. Supp. 3d 34, 66 (D.D.C. 2021) (quoting Sussman, 494 F.3d at 1117), an "agency must provide a detailed justification for [the exempt material's] non-segregability[,]" id. (quoting Johnson v. Exec. Off. for U.S. Att'ys, 310 F.3d 771, 776 (D.C. Cir. 2002)) (internal quotation marks omitted) (alterations in original). Generally, "[a]ffidavits attesting to the agency's 'line-by-line review of each document withheld in full' and the agency's determination 'that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions,' in conjunction with a Vaughn index describing the withheld record, suffice." Id. (quoting Johnson, 310 F.3d at 776). However, the Vaughn index "must provide a particularized explanation of non-segregability for each document." Ctr. for Biological Diversity v. Env't Prot. Agency, 279 F. Supp. 3d 121, 152 (D.D.C. 2017).

Here, the FBI identified 1,136 responsive pages, of which it released 377 in full, released 490 in part, and withheld 269 in full. Seidel Decl. ¶ 90. According to the Seidel Declaration, the 490 pages that were released in part "comprise a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on these pages." Id. ¶ 90(b). Regarding the 269 pages withheld in full, the Seidel Declaration avers that "all information on these pages was either fully covered by one or more of the cited FOIA exemptions, or determined that any non-exempt information on these pages was so intertwined with exempt material, no information could be reasonably segregated for release." Id. ¶ 90(c). Additionally, 162 of these pages were withheld because "they were duplicates of pages accounted for elsewhere in the FBI's production." Id. Upon review of the Seidel Declaration and the accompanying Vaughn Index, the Court concludes that the defendants' explanation suffices to establish compliance with the FOIA's segregability obligation. See Spurling, 425 F. Supp. 3d at 24.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendants' motion for summary judgment.

**SO ORDERED** this 25th day of September, 2026.[5]

REGGIE B. WALTON
United States District Judge

[5] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.